IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:25-CR-117-TAV-JEM |
| | ) | |
| BOBBY A. KNOWLES, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This case is before the undersigned for report and recommendation on Defendant Bobby Knowles's Motion to Suppress [Doc. 19]. *See* 28 U.S.C. § 636(b). The Indictment charges Defendant Knowles with being a felon in possession of a firearm and ammunition on September 13, 2025 [Doc. 3 p. 1]. It further charges that prior to the commission of this offense, Defendant had three prior convictions for qualifying offenses committed on different occasions [*Id.*].

This charge arises out of Defendant's encounter with law enforcement on September 13, 2025. On September 13, 2025, the Knox County Sheriff's Office ("KCSO") dispatcher received a call that an unknown man came to the caller's door asking for gas and was "snooping" around the property with another man despite being told the caller could not help them. A KCSO officer responded to the area and saw Defendant Knowles and a woman walking along the road a short distance from the property. The officer questioned the woman who said she was riding with some people who ran out of gas, so she began walking. The officer ordered Defendant to come to him, but Defendant briefly disappeared into the woods beside the road. When Defendant returned, the officer detained him and checked the couple's identification. As Defendant was placing his identification back in his pocket, a second officer saw a syringe in Defendant's pocket. The officer

removed the syringe, frisked Defendant, and removed ten bullets from inside the pocket previously containing the syringe. After advising Defendant and the woman of the *Miranda* warnings, the officer said a K-9 unit would search the woods. In response to the officer's question, Defendant stated he was a felon. Defendant then led the officers to the firearm hidden in the woods. The K-9 later found a magazine that went with the firearm.

Defendant moves to suppress all evidence flowing from the seizure and frisk of his person, arguing that these actions violated his rights under the Fourth Amendment [Doc. 19 p. 1]. Defendant argues the officers seized and frisked him without reasonable suspicion of any crime or that he was armed and dangerous [*Id*. at 4–6]. As a result of these alleged Fourth Amendment violations, Defendant contends that the firearm, magazine, ammunition, and his statements must be suppressed.

After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned finds Defendant lacks standing to challenge the seizure of the gun and magazine, because he abandoned those items in the woods before he was detained. Defendant, however, has standing to challenge the seizure of his person, the ammunition from his pocket, and his statements made during the stop. The undersigned also finds the officer had reasonable suspicion to seize Defendant and to ask him a moderate number of questions to either confirm or dispel his suspicions that Defendant was related to the report of trespass in the 911 call. After observing the syringe, the officer could properly frisk Defendant for officer safety and could seize the bullets from his pocket incident to his arrest. Finding Defendant's detention comported with the Fourth Amendment both in its inception and its scope, Defendant's statements are not the product of an unlawful detention. The undersigned therefore recommends the District Judge **DENY** Defendant's suppression motion [Doc. 19].

2

## I.  SUMMARY OF EVIDENCE

The parties appeared before the undersigned on February 26, 2026, for an evidentiary hearing on Defendant's Motion to Suppress [Doc. 26, Transcript]. Assistant United States Attorney Miriam Johnson appeared on behalf of the Government [*Id*. at 2]. Assistant Federal Defender Jonathan A. Moffatt represented Defendant Knowles, who was also present [*Id*.].

The Government presented the testimony of KCSO Captain Jason Lubienski, who stated that he has worked for the KCSO for twenty-six years [*Id*. at 3]. He said he first worked in corrections and, after completing the Knox County Law Enforcement Academy, has worked in the patrol division since 2003 [*Id*. at 4].

Captain Lubienski stated that while on patrol around 3:00 p.m. on September 13, 2025, he received a call from the dispatcher regarding suspicious people at an address on Badgett Road [*Id*.]. Captain Lubienski identified an audio recording of the 911 call to the dispatcher, which the Government played [*Id*.; Exh. 2]. The caller asked that an officer be sent to 8316 Badgett Road [Exh. 2]. He said the residence is in a remote location, and a man came to the door looking for gas [*Id*.]. The caller said he is visiting family and that he told the man he did not know of any gas, meaning for the man to leave, but now that man and another man were "snooping around the property" [*Id*.]. The caller said the men were both white and both wearing black hats and shirts [*Id*.]. He said the man who came to the door had tattoos and was wearing khaki pants [*Id*.]. He said the other man had on dark gray shorts [*Id*.]. The caller said the first man told him that they had run out of gas [*Id*.]. The caller said it was an "uncomfortable situation" because he was alone at the house, and people have come to the property "asking weird things like that in the past" [*Id*.]. The caller identified himself as Will and gave a telephone number [*Id*.]. He did not know if the men

3

had been drinking or had weapons [*Id*.]. He said he could not see the vehicle because the house has a long driveway, and he thought their vehicle was at the end [*Id*.].

Captain Lubienski testified that while in route eastbound to the caller's address, he came upon a Defendant Bobby Knowles and Sheila Williams walking westbound about one-quarter mile from the address on Badgett Road [Doc. 26 p. 5]. He said he made a U-turn and parked on the road next to Ms. Williams leaving his emergency equipment activated[1] [*Id*.]. Captain Lubienski described the road as a two-lane, rural road with affluent, waterfront properties that are widely spaced from each other on lots with acreage [*Id*.]. He said Ms. Williams was walking by 8304 Badgett Road, and Defendant was approximately fifty yards in front of her [*Id*. at 6]. Captain Lubienski said he approached Ms. Williams and told Defendant to come back toward him [*Id*.]. He said the first time he called to Defendant, Defendant ignored him [*Id*. at 7]. Captain Lubienski said the second time he called to Defendant, Defendant made an immediate left into the tree line [*Id*. at 6–7]. Captain Lubienski had Ms. Williams step off the road, while waiting for Defendant to reappear [*Id*. at 6].

Captain Lubienski said Defendant reappeared on the road, and he gave a third command for Defendant to walk back toward him, which Defendant did [*Id*. at 6–7]. Captain Lubienski said while trying to get Defendant to come toward him, Ms. Williams told him she was with another couple, who gave them a ride from Defendant's house to go pick up a pizza that she ordered from Casey's [*Id*. at 6–7]. Captain Lubienski said once Defendant reappeared, he observed Defendant was wearing gray shorts, a black t-shirt, and a black baseball cap, which matched the description he was given both on his computer and over the radio [*Id*. at 7]. He said as Defendant walked

---

[1] The video recording from Captain Lubienski's body camera reveals that his emergency lights were flashing but his siren was not activated [Exh. 2 15:14:47].

toward him, he asked what Defendant threw into the bushes, and Defendant responded, "Nothing," and that he had tripped [*Id*.].

Captain Lubienski testified that once both Defendant and Ms. Williams were in front of him, he told them they were detained and that he was investigating suspicious people on property that was the subject of a 911 call [*Id*.]. He said Defendant and Ms. Williams acknowledged being "with those people" [*Id*. at 8]. Captain Lubienski said Defendant explained that the man with the car now at 8316 Badgett Road came to Defendant's house earlier and asked for a battery [*Id*.]. Captain Lubienski said Defendant reported that he installed a battery from his boss's vehicle in the man's car, and he and Ms. Williams left his home in the man's car to get a pizza for Ms. Williams [*Id*.]. Captain Lubienski stated that Defendant and Ms. Williams said the man's car died or ran out of gas, and then they left the vehicle and started walking west on Badgett Road [*Id*.]. He said Defendant and Ms. Williams reported that a man and a woman were in the vehicle, which they described as either a Buick or a Lincoln that was gray or light gray [*Id*.].

Captain Lubienski said he asked Defendant and Ms. Williams for their identification. He said Defendant handed him a printout of his driver's license on a white, 8.5 x 11-inch paper [*Id*.]. He said Ms. Williams did not have a driver's license with her but provided her name, birthday, and Social Security number [*Id*. at 8–9]. Captain Lubienski said when he asked Ms. Williams for her identifying information, she said she had never been in jail before [*Id*. at 9]. He said Defendant remarked that he had been in jail and had just been released nine days earlier [*Id*.].

Captain Lubienski stated that a K-9 officer, who was also responding to the original call, came to the scene [*Id*. at 9–10]. He said Officer Thoman also came to the scene as his back up [*Id*. at 9–10]. Captain Lubienski said when he handed Defendant's identification back, Defendant folded it multiple times [*Id*. at 10]. He said when Defendant turned to the left and attempted to put

5

the folded paper in his side pocket, Officer Thoman observed a needle sticking out of Defendant's pocket [*Id*.]. Captain Lubienski said Officer Thoman removed the needle from Defendant's pocket for officer safety [*Id*.]. He said Officer Thoman then performed a brief pat down of Defendant [*Id*.]. He said during the pat down, Officer Thoman reached into Defendant's pocket where the needle had been and removed ammunition and a pocketknife [*Id*. at 10–11]. Captain Lubienski said after Officer Thoman removed the .40 caliber bullets from Defendant's pocket, Defendant told them he had been shooting on his property and that "he thought he could have bullets" [*Id*. at 11]. Captain Lubienski said after this statement, Officer Thoman provided the *Miranda* warnings to Defendant and Ms. Williams [*Id*.].

Captain Lubienski stated that after Officer Thoman read the *Miranda* rights, he walked to the point where Defendant left the road [*Id*.]. He said he did not see anything, returned to where Defendant and Ms. Williams were standing, and again asked Defendant what he put in the woods [*Id*.]. Captain Lubienski said he told Defendant that he would have a K-9 officer and his dog perform an "article search" in the wooded area and that the dog would alert on whatever he placed in the woods [*Id*. at 11–12]. He stated that Defendant then walked with him back to the point where Defendant previously entered the woods [*Id*. at 12]. He said Defendant told him that he was a convicted felon and did not want to get caught with a pistol [*Id*.]. Captain Lubienski stated that once they arrived at the location where Defendant previously entered the woods, Defendant told him that he had a pistol and where it was located [*Id*.]. He said Officer Thoman went into the woods and found the .40 caliber pistol where Defendant said it would be, which is next to the second wooden fencepost [*Id*.]. Captain Lubienski said the firearm did not have a magazine, and the magazine was later located in that same area by the K-9 [*Id*.].

Captain Lubienski testified that he was wearing a body camera during this incident and identified the video recording from his body camera [*Id*. at 13; Exh. 2]. The Government played the first twenty-four minutes of the video, starting at twenty-nine seconds, which is when Captain Lubienski got out of his patrol car [Exh. 2 15:14:07]. Captain Lubienski left his patrol car parked in one lane with its blue lights activated and encountered Ms. Williams in the opposite lane [*Id*. at 15:14:07–12]. Captain Lubienski yelled to Defendant to come here "for a second" [*Id*. 15:14:12–15]. Ms. Williams told Captain Lubienski that she did not go into anyone's yard and that she caught a ride, but they ran out of gas [*Id*. at 15:14:10–15]. She said she started walking because she was trying to get to the store [*Id*. at 15:14:15–20]. Captain Lubienski directed Ms. Williams to stand by the fence and yelled to Defendant, who was now walking toward him and Ms. Williams, to come here [*Id*. at 15:15:32–38]. Once Defendant was walking toward him and Ms. Williams, Captain Lubienski directed Ms. Williams to stay by the fence and not to reach into her purse [*Id*. at 15:14:40–49]. Captain Lubienski walked to the edge of the road behind his patrol car [*Id*. at 15:14:50–56]. As Defendant drew closer, Captain Lubienski asked him what he put in the woods, and Defendant responded, "Nothing" [*Id*. at 15:15:00–03]. Defendant said he fell [*Id*. at 15:15:05–06]. Captain Lubienski told Defendant to come here, to "park [his] butt against the fence," and asked what was going on [*Id*. at 15:15:07–11].

The video shows that Defendant stopped several feet from the fence and said he did not need to be detained because he had not done anything [*Id*. at 15:15:12–15]. Captain Lubienski told Defendant that he was detained because people were saying they were on their property [*Id*. at 15:15:16–19]. Captain Lubienski told Defendant that he was not in trouble, but if he did not stand by the fence, he would be more than just detained [*Id*. at 15:15:20–24]. Defendant pulled his

wallet from his back pocket, and Captain Lubienski told him not to reach into his pocket [*Id*. at 15:15:24–25].

The video recording reveals that Captain Lubienski told Defendant and Ms. Williams to relax and asked what they were doing [*Id*. at 15:15:27–29]. Defendant and Ms. Williams said they were riding with some people to the store [*Id*. at 15:15:30–32]. Captain Lubienski asked which people, and Defendant and Ms. Williams described the man and woman generally, said the couple had run out of gas, and said they were still at the property [*Id*. at 15:15:32–15:16:13]. Defendant and Ms. Williams confirmed they were with the other couple [*Id*. at 15:16:13–14]. Defendant stated that he lives nearby and gave his address [*Id*. at 15:16:15–25]. Captain Lubienski asked if Defendant had identification that stated his address [*Id*. at 15:16:25–26]. He also asked Ms. Williams for her identification and asked her whether she had anything in her purse that could hurt him, which she denied [*Id*. at 15:16:31–36]. Ms. Williams said she ordered a pizza from Casey's and asked the man and woman if they would give her a ride to the store [*Id*. at 15:16:38–44].

Captain Lubienski's body camera video shows that while Defendant and Ms. Williams were looking for their identification, he asked them what kind of car the couple had [*Id*. at 15:16:48–49]. Ms. Williams said it was a Buick, and Defendant said it was a Lincoln [*Id*. at 15:16:50–52]. Captain Lubienski asked for the car's color, and Defendant said it was "grayish, light gray" [*Id*. at 15:16:53–56]. Ms. Williams said she had left her identification at Defendant's house, and Defendant produced a white paper that he handed to Captain Lubienski [*Id*. at 15:16:57–15:17:09]. Captain Lubienski again asked them to describe the car [*Id*. at 15:17:11–12]. Ms. Williams said it was an old Buick with clothing and other items in it because the couple lives in their car [*Id*. at 15:17:13– 21]. Defendant said the man came to his

8

house and asked for a battery, so Defendant gave him a battery from Defendant's boss's truck [*Id.* at 15:17:22–40]. Defendant said they then headed this way and ran out of gas, and Ms. Williams agreed with that account [*Id.* at 15:17:40–42]. Defendant stated that when the man went onto someone else's property, he began walking home [*Id.* at 15:17:45–55].

The video recording shows that Captain Lubienski then wrote down Ms. Williams's full name, birth date, and Social Security number [*Id.* at 15:18:00–28]. Another patrol car stopped in the road and Captain Lubieski informed the officers that according to Defendant and Ms. Williams, the vehicle and two people were still at the property [*Id.* at 15:18:30–15:19:07]. After the other patrol car left, Captain Lubienski confirmed Ms. Williams's Social Security number and place of birth and took down Defendant's Social Security number [*Id.* at 15:19:13–30].

Captain Lubienski testified that at six minutes and six seconds into the video, Officer Tyler Thoman had arrived on the scene [Doc. 26 p. 14; Exh. 2 15:19:43]. The video shows that Ms. Williams said they told the man not to pull into anyone's driveway, and when he did, she wanted to have nothing to do with that situation [*Id.* at 15:19:51–15:20:05]. Captain Lubienski confirmed Defendant's address [*Id.* at 15:20:06–18]. Captain Lubienski then radioed for a records check, both "local and NCIC," on Defendant and Ms. Williams and requested "identifiers" for Ms. Williams [*Id.* at 15:20:20–58]. Captain Lubienski asked again why they got in the car with the couple, and Ms. Williams said the couple was taking them to Casey's to get a pizza [*Id.* at 15:21:15–23]. Defendant asked Captain Lubienski for water, and Captain Lubienski said if Defendant had no warrants, he would give him some water [*Id.* at 15:21:44–15:22:00]. Defendant said he just got out of jail on Friday, and Ms. Williams said she had been held overnight for public intoxication but otherwise had not been to jail [*Id.* at 15:21:01–09]. Defendant said he just got out

9

of jail for not paying fines and costs, and Captain Lubienski asked what his original charge was [*Id*. at 15:22:12–22]. Defendant generalized it was for "stupid sh*t" [*Id*. at 15:22:29–31].

The video recording from Captain Lubienski's body camera video shows that nine minutes and twenty seconds into the video, the dispatcher reported that Defendant had a suspended driver's license and was wanted in Ohio for probation violations with no extradition and also in Florida for failure to appear on battery with no extradition [*Id*. at 15:22:55–15:23:40]. The dispatcher reported that Ms. Williams had a valid driver's license and confirmed her Social Security number and other identifiers [*Id*. at 15:23:45–15:24:24]. Defendant asked if he was free to go [*Id*. at 15:24:45–47]. Captain Lubienski returned Defendant's identification paper and said Defendant could go in a minute and that he would get Defendant a bottle of water as promised [*Id*. at 15:24:48–53]. Captain Lubienski walked to his patrol car and retrieved a water bottle, then returned to the fence where Defendant and Ms. Williams were standing [*Id*. at 15:24:53–15:25:14]. Captain Lubienski asked Defendant, who was putting his identification paper back into his wallet, when he got out of jail, and Defendant said on Friday [*Id*. at 15:25:18–21].

The video recording reveals that just after Defendant put his wallet in the pocket of his shorts, Officer Thoman asked Defendant to turn around and removed a syringe from Defendant's pocket [*Id*. at 15:25:53–15:26:01]. Officer Thoman then patted down Defendant's pocket before reaching inside his pocket [*Id*. at 15:26:02–17]. Defendant pulled away, and Officer Thoman handcuffed Defendant [*Id*. at 15:26:18–41]. Defendant denied having any drugs in his pocket [*Id*. at 15:26:48]. Officer Thoman searched inside Defendant's pocket and seized bullets [*Id*. at 15:26:48–15:27:05]. Captain Lubienski asked Defendant if he had felony conviction or just misdemeanor convictions [*Id*. at 15:27:08–13]. Defendant said it did not matter because he had only bullets and was shooting on private property at his house [*Id*. at 15:27:13–36]. Officer

10

Thoman searched Ms. Williams's purse [*Id*. at 15:28:34–15:30:42]. Captain Lubienski radioed for a K-9 unit to come to the scene [*Id*. at 15:30:18]. At seventeen minutes and twenty-six seconds into the video, Officer Thoman handcuffed Ms. Williams [*Id*. at 15:31:08–27]. Captain Lubienski called an officer who had responded to 8316 Badgett Road and informed him that Defendant had bullets in his pocket but not firearm and Ms. Williams had what appeared to be cocaine [*Id*. at 15:31:34–49]. The other officer, who was with the vehicle in the driveway, said the officers could detain Defendant and Ms. Williams and bring them to the location of the vehicle [*Id*. at 15:31:55–58]. Captain Lubienski said that was what they were doing now [*Id*. at 15:31:59–15:32:01]. Officer Thoman read the *Miranda* rights to Defendant and Ms. Williams from a card [*Id*. at 15:32:12–34].

At nineteen minutes and ten seconds into the video, Captain Lubienski left Officer Thoman standing with Defendant and Ms. Williams and walked to the spot where Defendant had entered and emerged from the woods [*Id*. at 15:32:48–15:33:35]. Seeing nothing, he returned to the fence [*Id*. at 15:33:41–15:34:13]. Captain Lubienski told Defendant that a K-9 officer would perform an "article search" and his dog would detect anything Defendant threw into the woods and that the officers would then charge Defendant for it [*Id*. at 15:34:23–51]. Captain Lubienski said if Defendant was honest, he would help him out, but if Defendant continued to say he just fell, then he would get more charges [*Id*. at 15:34:53–15:35:04]. Captain Lubienski said he would bring the K-9 officer back to their location and the K-9 would track Defendant's steps [*Id*. at 15:35:05–10]. Defendant, who was still handcuffed, then nodded and walked with Captain Lubienski to the edge of the fence [*Id*. at 15:35:10–52]. Captain Lubienski said he would try to make sure that Officer Thoman did not "pencil whip" Defendant and again asked if Defendant was a convicted felon, and Defendant affirmed that he was [*Id*. at 15:35:24–44]. Officer Thoman put Ms. Williams in his

11

patrol car and joined Captain Lubienski and Defendant [*Id*. at 15:36:00–13]. Defendant directed Officer Thoman to the gun but said he did not know where the magazine was [*Id*. at 15:36:18–15:37:34]. Officer Thoman asked if Defendant threw anything else into the woods, and Defendant denied throwing anything else, responding that he was a convicted felon and did not want to get caught with a firearm [*Id*. at 15:37:47–53]. Captain Lubienski testified that after that conversation with Defendant, he called the K-9 officer to the scene and the magazine was located [Doc. 26 p. 15].

On cross-examination, Captain Lubienski testified that he did not hear the 911 call received by the dispatcher [Doc. 26 p. 16]. He said, instead, the dispatcher radioed the information from the call to the KCSO officers and sent the information on their in-car computers [*Id*.]. Captain Lubienski agreed the log of the dispatcher's statements to officers from that day shows the dispatcher reported "two white males snooping around the property" [*Id*. at 16–17; Exh. 3]. He agreed the words "suspicious" and "prowling" do not appear on the dispatcher's log [Doc. 26 p. 17].

Defendant introduced the dispatcher's log into evidence [Exh. 3]. The log reports a call from "Will" and the location as 8316 Badgett Road in Knox County [*Id*. at 1]. The log states "2WM.. SNOOPING AROUND THE PROP.. ONE KHAKI PANTS BLK TSHIRT BLK HAT TATTS .. OTHER SUB .DRK GRY SHORTS. BLK SHIRT BLK HAT. .ADV THAT FIRST SUB SAID HE WAS OUT OF GAS.." [*Id*.]. The log further states the caller "WANTS SUBS CHECKED OUT AND REM" and "UNK WPNS UNK 1058—NO VEH DESC" [*Id*.].

Defense counsel replayed the audio recording of the 911 call [*Id*. at 18; Exh. 1]. Captain Lubienski agreed that the caller Will said the people on the property were "kind of snooping" [Doc. 26 p. 18]. He also agreed the caller said it was "kind of an uncomfortable situation" and

12

talked about other situations where people came to the house on foot [*Id.*]. Captain Lubienski also agreed that the houses on Badgett Road are on large lots and have long driveways [*Id.* at 19]. He said the caller mentioned that the people who came to the door asked him for gas [*Id.*].

Captain Lubienski stated that he was on the way to the caller's address when he saw Defendant and Ms. Williams [*Id*]. He did not know how long it took him to get there after receiving the dispatcher's report [*Id.*]. Captain Lubienski said to his knowledge, the Tennessee Code Annotated does not include "kind of snooping around" or asking for gas as crimes [*Id.*]. Captain Lubienski testified that after his interaction with Defendant, he went to 8316 Badgett Road [*Id.* at 20]. He agreed he saw a car broken down in the driveway at that address, that the car would not start, and that the car was later towed [*Id.* at 21].

Defense counsel next questioned Captain Lubienski about portions of his body camera video [*Id.*; Exh. 2]. Captain Lubienski agreed that by timestamp 15:15:30 (one minute fifty-three seconds into the video), Defendant was detained, and he had told Defendant that he was detained [Doc. 26 p. 21]. He agreed that at this point, Defendant was not free to leave [*Id.*]. Captain Lubienski stated that when he saw Defendant walking along the road, Defendant was not on anyone's property [*Id.* at 21–22]. He agreed that at this point, he could not arrest Defendant [*Id.* at 22].

Captain Lubienski testified that at timestamp 15:16:27 (two minutes fifty seconds into the video) on his body camera video, Defendant had told him that he lives on Tooles Bend Road, which Captain Lubienski agreed is connected to Badgett Road [Doc. 26 p. 22]. He said at timestamp 15:17:39 (four minutes and two seconds into the video), Defendant had provided his identification [*Id.*]. Captain Lubienski said he did not get identification from Ms. Williams [*Id.* at 23]. He agreed that he called the records division with Defendant's information soon after

13

obtaining his identification [*Id*.]. Captain Lubienski stated that at timestamp 15:21:00 (seven minutes and twenty-three seconds into the video), he was still awaiting the records check on Defendant [*Id*. at 24]. After reviewing an additional portion of the body camera video [Exh. 2 15:21:51–15:24:50], Captain Lubienski affirmed the records division reported that Defendant had arrest warrants in other states, but none were extraditable [Doc. 26 p. 25]. He agreed that at this point, he had no basis to arrest Defendant [*Id*.]. He agreed that Defendant asked if he was free to go and that he told Defendant he could not go because the officers had not finished their investigation [*Id*.]. Captain Lubienski stated that even though he had the report from the records division, he did not know whether Defendant had outstanding warrants because several local agencies such as Anderson County, Blount County, and Alcoa must be contacted directly to check for outstanding warrants [*Id*.]. He acknowledged he did not contact these agencies because he learned that Defendant was a convicted felon and of the existence of the firearm in the woods after Defendant received the *Miranda* warnings [*Id*. at 26].

Captain Lubienski agreed that Defendant led him to a wooded area and pointed out the firearm after he received the *Miranda* warnings [*Id*.]. He said Defendant also possessed drug paraphernalia in plain view in his pocket [*Id*.]. Captain Lubienski said he did not need to ask Defendant if he needed the syringe for medical reasons because he knew that diabetics do not carry needles in their pockets like Defendant did [*Id*.].

After reviewing another portion of the body camera video [Exh. 12 15:24:50–15:26:28], Captain Lubienski stated that Officer Thoman searched Defendant's pocket [Doc. 26 p. 27]. He agreed that Officer Thoman removed some bullets from Defendant's pocket and that Defendant was handcuffed [*Id*. at 27–28].

14

On redirect examination, Captain Lubienski testified that at timestamp 15:25:35 on his body camera video, Officer Thoman removed the syringe with a needle from Defendant's pocket and Defendant was handcuffed [*Id*. at 28–29]. He said after Defendant was in handcuffs, Officer Thoman removed a knife and bullets from Defendant's pocket [*Id*. at 29; Exh. 2 15:26:54–15:27:43]. He said Officer Thoman also removed a spoon with residue from Defendant's pocket [Doc. 26 pp. 29–30]. Captain Lubienski agreed that the spoon was drug paraphernalia [*Id*. at 30].

Following Captain Lubienski's testimony and the parties' arguments, the undersigned took the motion under advisement.

## II.   FINDINGS OF FACT

Shortly before 3:00 p.m. on September 13, 2025, the Knox County dispatcher received a 911 call that two white males were "snooping around" 8316 Badgett Road. The dispatcher radioed for an officer to respond to 8316 Badgett Road regarding a report of two white males snooping around the property. The dispatcher stated that one subject was wearing khaki pants, a black t-shirt, and a black hat; had tattoos; and said he was out of gas. The dispatcher said the other subject wore dark gray shorts, a black shirt, and a black hat. The dispatcher radioed that the caller wanted the subjects checked out and removed from the property.

KCSO Captain Jason Lubienski responded to the dispatch, and while in route to the residence, he saw a black female and a white male walking in the road about one-quarter mile from the residence, which was located in a residential area with houses located far back from the road. Captain Lubienski stopped his patrol car in the road with his emergency lights activated and approached the woman, whom he later identified as Sheila Williams. He called to the man, whom he later identified as Defendant Bobby Knowles, and who was around fifty yards ahead of Ms. Williams, to come to him, but Defendant kept walking in the opposite direction. Captain

15

Lubienski directed Defendant to come to him a second time, and Defendant turned abruptly from the road and disappeared into the woods. Ms. Williams told Captain Lubienski that she did not go into anyone's yard. She said that she had caught a ride to pick up a pizza, but they ran out of gas, so she began walking. Captain Lubienski directed Ms. Williams to step off the road onto the shoulder.

When Defendant emerged from the woods, Captain Lubienski called a third time for Defendant to come to him. As Defendant walked toward him, Captain Lubienski noticed Defendant was wearing a black shirt, gray shorts, and had a black baseball cap. Captain Lubienski asked Defendant what he had thrown into the woods, and Defendant said, "Nothing," and that he fell. When Defendant got to Captain Lubienski and Ms. Williams, Captain Lubienski told Defendant to stand against the fence bordering the road. Defendant stopped several feet from the fence and objected that he did not need to be detained because he had not done anything. Captain Lubienski said Defendant was detained because law enforcement was investigating a report of people on private property.

Once both Ms. Williams and Defendant were standing against the fence, Captain Lubienski asked them what they were doing. Defendant and Ms. Williams said they were riding with a man and woman ("the couple") to the store, and the couple ran out of gas and were still at the property. Defendant said he lived nearby and gave his address. Captain Lubienski asked Defendant and Ms. Williams for their identification and to describe the couple's car. Ms. Williams said it was a Buick, and Defendant said the car was a light gray Lincoln. Ms. Williams said she left her identification at Defendant's house. Defendant produced a white paper containing a printout of his driver's license information. Captain Lubienski again asked them to describe the couple's car. Ms. Williams said the car was an older Buick that contained the couple's belongings and that they

16

lived out of their car. Defendant explained that the man came to his house and requested a battery. Defendant said he installed a battery in the man's car and that they left his house in the man's car. Defendant said the car ran out of gas, and when the man went onto someone's property, he began walking home.

While Captain Lubienski was gathering Ms. Williams's identifying information, other officers responding to the caller's address stopped to speak with him. Captain Lubienski told the other officers that Defendant and Ms. Williams said the vehicle and two people were still at the property. The other officers proceeded to the property. Ms. Williams gave Captain Lubienski her name, date of birth and social security number. Defendant also provided his Social Security number at Captain Lubienski's request. KCSO Officer Tyler Thoman responded to the scene as Captain Lubienski's back up. Ms. Williams said they told the man not to pull into someone's driveway and, when he did, she did not want to be a part of that situation. Captain Lubienski radioed for a records check for outstanding warrants on Defendant and Ms. Williams and asked for confirmation of Ms. Williams's identity.

Captain Lubienski asked Defendant and Ms. Williams why they got in the car with the unidentified couple. Ms. Williams said the couple was taking them to pick up a pizza. Defendant asked for water, and Captain Lubienski stated that he would give Defendant water after receiving the information from the records check if Defendant had no outstanding warrants. Ms. Williams said she had never been to jail other than being held overnight for public intoxication, and Defendant remarked that he had just got out of jail.

Approximately nine minutes after he first stopped beside Defendant and Ms. Williams, Captain Lubienski learned pursuant to the records check that Defendant had a suspended driver's license and outstanding warrants in two other states, but the warrants were not extraditable. He

17

also learned that Ms. Williams had a valid driver's license. Captain Lubienski returned Defendant's identification paper and then retrieved a bottle of water from his patrol car for Defendant. Defendant folded the paper, placed it in his wallet, and placed his wallet in the pocket of his shorts. Officer Thoman observed a syringe protruding from Defendant's pocket and removed it. Officer Thoman then frisked Defendant, placed Defendant in handcuffs, and removed bullets, a pocketknife, and a spoon with residue from the pocket that held the syringe. Captain Lubienski asked Defendant if he had a felony conviction, but Defendant said it did not matter because he only had bullets and was shooting on private property at his house. Officer Thoman also handcuffed Ms. Williams after discovering suspected cocaine in her purse. Captain Lubienski radioed for a K-9 unit to come to the scene. Officer Thoman advised Defendant and Ms. Williams of the *Miranda* warnings.

Captain Lubienski walked to the location where he saw Defendant enter the woods but did not find anything. He told Defendant that the K-9 officer would perform an article search with his dog and locate anything that Defendant had thrown into the woods. Captain Lubienski told Defendant if he was honest, rather than continuing to say that he tripped when he went into the woods, he would help Defendant, and it would mean fewer charges. Captain Lubienski asked again if Defendant was a convicted felon, and Defendant confirmed that he was. Defendant said he did not want to get caught with a firearm. Defendant then directed Captain Lubienski and Officer Thoman to the location of a gun on the ground beside the fence in the wooded area. The K-9 unit subsequently located the gun's magazine.

## III.    ANALYSIS

The Fourth Amendment protects citizens from unreasonable searches or seizures. U.S. Const. amend IV. Defendant Knowles argues that law enforcement's seizure and frisk of his

18

person violated his rights under the Fourth Amendment. Specifically, he contends that the officer lacked reasonable suspicion of any crime and, thus, could not detain him beside the road. He also argues that the officers impermissibly frisked him because they did not have reasonable suspicion that he was armed and dangerous. Defendant asks the Court to suppress all evidence flowing from the seizure, including the firearm and magazine, the ammunition seized from his pocket, and his statements, which he contends were the fruit of his illegal detention.

For the reasons discussed below, the undersigned finds Defendant cannot challenge the seizure of the gun and magazine but has standing to challenge the seizure and frisk of his person. The undersigned also finds Captain Lubienski had reasonable suspicion to conduct an investigatory detention of Defendant to investigate whether he was one of the people who were trespassing at 8316 Badgett Road. After observing a syringe with a needle in plain view in Defendant's pocket, the officers could frisk Defendant for officer safety. The officer properly seized the ammunition from Defendant's pocket incident to his arrest, and his statements were not the product of an unlawful detention. Accordingly, Defendant's suppression motion should be denied.

### A. Standing

As an initial matter, the Court examines whether Defendant has standing to contest the seizure of the firearm and magazine. To successfully bring a Fourth Amendment claim, the challenger must have a legitimate expectation of privacy in the place searched or the thing seized. *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978) ("[The] capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." (citations omitted)). "[S]tanding is 'an element' of a Fourth Amendment suppression claim" and a "defendant bears the 'burden' of showing he [or she] has standing." *United States v. Russell*, 26 F.4th 371, 375

(6th Cir. 2022) (citation omitted). The term "standing" has become "shorthand" for the requirement that a defendant must show that a search or seizure infringed upon his or her own rights. *Id.* at 374 (citation omitted).

An individual whose person is seized by law enforcement has standing to challenge the constitutionality of the seizure. The Government asserts that Defendant lacks standing to challenge the seizure of the firearm and magazine because he was not seized when he abandoned them [Doc. 22 p. 3]. It contends Defendant was not seized when he went into the woods because he did not submit to Captain Lubienski's attempt to stop him [*Id*. at 3–4]. A seizure occurs when an officer applies physical force to detain an individual or when the individual submits to the officer's "assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991). In contrast, an officer's "show of authority" alone—including the officer chasing after the individual and ordering him to stop—without the individual's submission, does not trigger the protections of the Fourth Amendment. *Id*. at 626–29. "Since *Ho[d]a[r]i D.*, courts have accepted the principle that a person who refuses to submit to police commands to stop, and subsequently flees, has not (yet) been 'seized.'" *United States v. Mock*, No. 19-20839, 2020 WL 2300238, at *4 (E.D. Mich. May 8, 2020) (examining Sixth Circuit case law adhering to this principle).

An individual has no legitimate expectation of privacy in items thrown away or abandoned. *United States v. Dillard*, 78 F. App'x 505, 511–12 (6th Cir. 2003) (collecting cases). Thus, "[e]vidence obtained from a defendant's abandonment of property during a chase is not subject to Fourth Amendment protections." *Mock*, 2020 WL 2300238, at *4; *United States v. Ward*, 756 F. App'x 560, 565, 567–68 (6th Cir. 2018) (finding defendant who fled from officer's direction to come here on a public sidewalk was not seized under Fourth Amendment and, thus, the firearm he abandoned in flight was not subject to suppression); *United States v. Martin*, 399 F.3d 750, 752

20

(6th Cir. 2005) (observing "the fourth amendment does not apply to anything one may abandon while fleeing the police in an attempt to avoid a seizure" (citing *Hodari D.*, 499 U.S. at 629)).

Here, Captain Lubienski twice called to Defendant to come to him, but Defendant did not submit to these requests and, instead, continued walking in the opposite direction and then turned into the woods and hid the firearm and magazine. Defendant discarded the firearm and magazine so that he would not be caught with it, and he had no proprietary interest or expectation of privacy in the wooded area where he placed it. *See United States v. Gonzalez*, No. 3:24-CR-122, 2025 WL 2375388, at *8 (E.D. Tenn. Aug. 15, 2025) (finding that although defendant did not disclaim ownership of the backpack, "in discarding the backpack in a public space during his flight with law enforcement, [he] abandoned the backpack and relinquished any legitimate expectation of privacy he may have had in it"); *United States v. McGee*, No. 23-20045, 2024 WL 3488719, at *4 (E.D. Mich. July 18, 2024) (finding defendant was not seized for purposes of Fourth Amendment when he fled from officers who asked if he had a gun and then he abandoned the gun during his flight). *C.f. United States v. Tapia*, 2022 WL 1487041, at *9–10 (S.D. Ohio May 10, 2022) (finding defendant did not abandon duffel bag containing illegal drugs when he dropped it onto his roof facing his fenced backyard when officers arrived to arrest him). Accordingly, Defendant abandoned the firearm and magazine before he submitted to the officer's authority and lacks standing to challenge its seizure.

Defendant does have standing, however, to challenge the seizure and frisk of his person. *United States v. Phillips*, 677 F. App'x 294, 295 (6th Cir. 2017) ("A Fourth Amendment seizure occurs only when an officer (1) "applies physical force to restrain a suspect" or (2) uses a "show

21

of authority" that actually causes the suspect to submit." (citing *United States v. Jeter*, 721 F.3d 746, 751–52 (6th Cir. 2013)))[2]

### B.     Investigatory Detention

Defendant argues that Captain Lubienski lacked reasonable suspicion of any crime and, thus, lacked reasonable suspicion to detain him [Doc. 19 pp. 3–4]. He asserts that he was detained when he returned to Captain Lubienski and Ms. Williams, and Captain Lubienski told him he was detained [Doc. 26 p. 39]. Defendant contends at this point, no criminal activity was apparent from either the 911 call or the officer's observations of Defendant's behavior [*Id*. at 37–38].

Law enforcement may temporarily seize a person and conduct an investigatory or *Terry* stop, if the officer has "reasonable suspicion" of criminal activity stemming from "specific and articulable" facts which the officer knew at the time of the seizure. *Terry v. Ohio*, 392 U.S. 1, 21–22, 27 (1968); *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) ("*Terry*, a limited exception to the normal requirements of probable cause, permits a police officer briefly to detain a person or property for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." (citation omitted)). Reasonable suspicion is a quantum of proof that is "considerably less" than a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch' that

---

[2]     At the evidentiary hearing, Defendant argued that he has standing to challenge the search of the firearm and magazine because the officer's "thought that there's a gun in those woods arises upon the finding of the bullets," and because Defendant led the officer to the firearm while he was detained [Doc. 26 p. 36]. The undersigned disagrees. Captain Lubieski suspected that Defendant threw something into the woods from the beginning of the encounter as evidenced by his first question to Defendant was to ask what Defendant threw into the woods. But even if Defendant had standing to challenge the seizure of the firearm and magazine, the Court would find Defendant's Fourth Amendment challenge fails for reasons stated in the next section.

criminal activity may be afoot." *United States v. Bridges*, 626 F. App'x 620, 623 (6th Cir. 2015) (quoting *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir.), *aff'd*, 571 U.S. 1031 (2013))); *see also Terry*, 392 U.S. at 27 (holding that an investigatory stop must be based on more than the officer's "inchoate and unparticularized suspicion or 'hunch'"). Courts evaluate the presence of reasonable suspicion based upon the totality of circumstance at the time the officer decided to make the investigatory stop. *Bridges*, 626 F. App'x at 623. A seizure, however brief, that lacks reasonable suspicion contravenes the Fourth Amendment. *United States v. Jones*, 562 F.3d 768, 773 (6th Cir. 2009).

Officers may draw upon their experience and training "to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted). "Reasonable suspicion need not arise from an officer's own observations; rather, it may arise from informant tips and dispatcher information." *Williams v. Leatherwood*, 258 F. App'x 817, 821 (6th Cir. 2007) (citation omitted). Additionally, an officer may rely on the observations of a fellow officer that have been communicated to him or her. *United States v. Lyons*, 687 F.3d 754, 765 (6th Cir. 2012).

Here, considering the totality of the circumstances, Captain Lubienski had reasonable suspicion to detain Defendant at the point he told Defendant he was detained to investigate possible trespass on private property. "A person commits criminal trespass if the person enters or remains on property, or any portion of property, without the consent of the owner." Tenn. Code Ann. § 39-14-405.[3] At the time Captain Lubienski told Defendant he was detained the officer knew that the dispatcher received a 911 call from a caller at 8316 Badgett Road that two white males were

---

[3]   "Consent may be inferred in the case of property that is used for commercial activity available to the general public or in the case of other property when the owner has communicated the owner's intent that the property be open to the general public." Tenn. Code Ann. § 39-14-405.

23

"snooping" around private property, and the caller wanted the individuals checked out and removed.[4] He also knew one of the men said they had run out of gas, and one was wearing gray shorts, a black shirt, and a black hat. Captain Lubienski saw Defendant and Ms. Williams about one-quarter mile from the residence and walking away from it. No one else was walking in the area. When Captain Lubienski stopped and exited his vehicle, Ms. Williams immediately provided a connection to the call by stating that she was riding with some people who ran out of gas. She also attempted to distance herself from trespassing by stating that she was not in anyone's yard. Additionally, Defendant, a white male, was wearing gray shorts, a black t-shirt, and a black baseball cap, which matched the description of one of the men on the property. Defendant appeared to throw something into the woods before he responded to Captain Lubienski's request that he come to the officer. These circumstances considered together gave Captain Lubienski reasonable suspicion that Defendant could be one of the men trespassing at 8316 Badgett Road.

### C.      Frisk

A stop that "is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry*, 392 U.S. at 18. Once a court determines a seizure was proper, it must still assess "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20. A lawful stop can nevertheless "violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citation omitted). In evaluating the

---

[4]      At the evidentiary hearing, Defendant argued that neither snooping nor asking for gas are crimes [Doc. 26 pp. 37–38]. But the caller told the dispatcher that the man asked for gas, that he turned the man away stating he knew of no gas, and yet the man remained on the property, "snooping" around with a second man. Given that it was reported the men remained on private property without the caller's consent, the officer could properly investigate whether they were trespassing. *See* Tenn. Code Ann. § 39-14-405.

24

scope of an investigatory stop, the Court examines "whether the detention was (1) sufficiently limited in time and (2) involved the least intrusive means that were reasonably available." *United States v. Mendoza-Ricardo*, 815 F. App'x 970, 976 (6th Cir. 2020) (citing *Davis*, 430 F.3d at 354). Thus, law enforcement must have "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). The Court should not second guess the investigatory techniques employed but, instead, must determine whether law enforcement acted reasonably. *Sharpe*, 470 U.S. at 686–87.

To justify a frisk, an officer must have reasonable suspicion that the individual is armed and dangerous. *United States v. Coker*, 648 F. App'x 541, 545 (6th Cir. 2016) (citing *Arizona v. Johnson*, 555 U.S. 323, 327, (2009)). The purpose of a pat down is "to allow the officer to pursue his investigation without fear of violence[.]" *Adams v. Williams*, 407 U.S. 143, 146 (1972). Even the "legitimate and weighty" interest of officer safety, however, requires reasonable suspicion that a suspect is armed and dangerous before a frisk is warranted. *United States v. Noble*, 762 F.3d 509, 521 (6th Cir. 2014) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977)). An individual's failure to comply with the officer's directions can support reasonable suspicion to frisk. *Id*. at 523.

Officer Thoman's frisk of Defendant Knowles was reasonable. Officer Thoman observed a syringe protruding needle-first from Defendant's pocket. Officer Thoman then seized the syringe, which Captain Lubienski testified was immediately recognizable as drug paraphernalia because diabetics do not carry needles like that. An officer's belief that an individual is armed and dangerous when the officer observes a weapon protruding his or her pocket is entirely reasonable. Other courts have recognized that a syringe with a needle is a threat to officer safety. *See United States v. Harrington*, 557 F. Supp. 3d 323, 333–34 (D.N.H. 2021) (concluding officer's experience

25

that drug users could use hypodermic needles to stab someone, including responding medical personnel, in combination with defendant's abnormal behavior provided reasonable suspicion to perform a *Terry* pat down) (collecting cases), *aff'd by* 56 F.4th 195 (1st Cir. 2022) (affirming frisk based upon suspicion of drug use in an area known for same, the officer's observation of symptoms of opioid use, the suspect reaching toward the car's console, and non-compliance with officer's request for suspect to raise his hands); *United States v. Rush*, No. 15–CR–105, 2015 WL 4364669, at * (D. Minn. July 13, 2015) ("The limited pat-down search for needles was permissible under *Terry* to ensure officer safety, since the hypodermic needles could easily be used as weapons."). In addition, Defendant ignored Captain Lubienski's first two requests to come to him. These circumstances justified a frisk for officer safety.

Moreover, upon observing and seizing the syringe, Officer Thoman had probable cause to arrest Defendant for possession of drug paraphernalia and could search his person incident to his arrest. *United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007) (explaining that "[o]nce a lawful arrest has been made, the police officer is permitted to search the individual" incident to the arrest); *United States v. Bradshaw*, 102 F.3d 204, 213 (6th Cir. 1996) ("It is well-settled that law enforcement officers are permitted to search an arrestee's person incident to an arrest." (citations omitted)). Thus, the search of Defendant's pocket and seizure of the bullets did not violate the Fourth Amendment.[5] Finding that Defendant was lawfully detained, the undersigned finds his statements were not the product of an unlawful detention.

---

[5] The video from Captain Lubienski's body camera shows Officer Thoman searching inside Defendant's pockets after he conducted a *Terry* pat down. At the evidentiary hearing, the Government argued that Officer Thoman patted the outside of Defendant's pocket before reaching in but did not address how the officer could properly search inside Defendant's pocket [Doc. 26 p. 35]. It asserted that when Officer Thoman tried to reach inside Defendant's pocket, Defendant began pulling away, and the officer handcuffed him so that he could complete the "safety search" to confirm Defendant had no other weapons on his person [*Id*.]. Defendant did not respond to this

## IV. CONCLUSION

For all the reasons explained herein, the undersigned respectfully **RECOMMENDS** that the District Judge **DENY** Defendant's Motion to Suppress [**Doc. 19**].[6]

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

argument, nor argue about the frisk at the evidentiary hearing. The record lacks sufficient evidence to determine whether Officer Thoman recognized the items in Defendant's pocket to be a knife and bullets by plain feel during the frisk. Nevertheless, the undersigned finds these items were properly seized from Defendant's pockets incident to his arrest.

[6] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to appeal the District Court's order. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 555 U.S. 1080 (2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). "[T]he district court need not provide de novo review where objections [to this report and recommendation] are [f]rivolous, conclusive, or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation omitted). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs.*, 829 F.2d 1370, 1373 (6th Cir. 1987).

27